UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JOHN DIXON and
ALEXANDRIA HYLAND,

                 Plaintiffs,

        -against-

CITY OF NEW YORK, SOPHIA                        **COMPLAINT**
CARSON, FERNANDO GUIMARES,
CHRISTOPHER THOMAS, MICHAEL
PETITO, EVANGELOS DIMITRAKAKIS,
JOEL POLICHRON, EDWARD MEJIA,
DANILO MALDONANDO, and
ANDREW BLAKE,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

       Plaintiffs John Dixon and Alexandria Hyland, by their attorneys, Lumer &

Neville, as and for their Complaint, hereby allege as follows, upon information and belief:


## PARTIES, VENUE and JURISDICTION

       1.       At all times hereinafter mentioned, plaintiffs were adult residents of

Kings County, within the State of New York.

       2.       At all relevant times hereinafter mentioned, defendant City of New

York was and is a municipal corporation duly organized and existing under and by virtue of

the laws of the State of New York and acts by and through its agencies, employees and

agents, including, but not limited to, the New York City Police Department ("NYPD"), and

their employees.

       3.       At all relevant times hereinafter mentioned, defendant Sophia Carson

(Tax 941946) was employed by the City of New York as a member of the NYPD.

4.     At all relevant times hereinafter mentioned, defendant Fernando Guimares was employed by the City of New York as a member of the NYPD.

5.     At all relevant times hereinafter mentioned, defendant Christopher Thomas (Tax 926370) was employed by the City of New York as a member of the NYPD.

6.     At all relevant times hereinafter mentioned, defendant Michael Petito (Shield 2233) was employed by the City of New York as a member of the NYPD.

7.     At all relevant times hereinafter mentioned, defendant Evangelos Dimitrakakis (Shield 1793) was employed by the City of New York as a member of the NYPD.

8.     At all relevant times hereinafter mentioned, defendant Joel Polichron (Shield 4640) was employed by the City of New York as a member of the NYPD.

9.     At all relevant times hereinafter mentioned, defendant Edward Mejia (Shield 0592) was employed by the City of New York as a member of the NYPD.

10.     At all relevant times hereinafter mentioned, defendant Danilo Maldonando (Shield 1059) was employed by the City of New York as a member of the NYPD.

11.     At all relevant times hereinafter mentioned, defendant Andrew Blake (Shield 27155) was employed by the City of New York as a member of the NYPD.

12.     At all times relevant herein, the defendants were on duty and acting within the scope of their employment, and their acts were done in furtherance of the City of

New York's interests and without legal justification or excuse.

13.     Each of the above named individual defendants are sued herein in their official and individual capacities.

14.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

15.     Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the defendant City of New York resides, and where the majority of the actions complained of herein occurred.

## RELEVANT FACTS

16.     As of November 13, 2013, plaintiffs John Dixon and Alexandria Hyland resided together in a basement apartment located at 604 Georgia Avenue, in Kings County (the "Premises").

17.     604 Georgia Avenue was at all times relevant herein a two-story, five-unit building, which contained two apartments on the top floor, known as 2F and 2R, and two apartments on the first floor, known as 1F and 1R, as well as the Premises in the basement.

18.     The Premises was not accessible from the front door and common area that led to the four other apartments. Rather, it was directly accessible through a separate front door facing towards the street.

19.     As of November 13, 2013, Jeff Lysius and Natasha Smith resided in an

Apartment 2F on the second floor ("2F"), with Ms. Smith's three minor children.

The Entry and Arrests

20.    On November 13, 2013, at or around 6:00 to 6:15 a.m., plaintiffs were woken by the sound of police offices forcibly entering the Premises.

21.    These officers, which included at least defendant Carson, were then members of the NYPD's Narcotics Bureau Brooklyn North unit ("NBBN").

22.    The entry into the Premises was made pursuant to a search warrant.

23.    At the same time as the entry into the Premises, other defendants and members of the NBBN were forcibly entering 2F.

24.    The entry into 2F was made pursuant to a search warrant.

25.    Upon and following their entry, certain of the individual defendants struck and assaulted John Dixon. Both plaintiffs have described these officers during depositions on April 23, 2015.

26.    The plaintiffs were seized, handcuffed, and arrested.

27.    The defendants, along with several other officers then searched the Premises.

28.    Guinares had the rank of Captain and was the senior supervising officer at the scene.

29.    Hammond had the rank of Lieutenant and was the second-in-command at the scene.

30.    Thomas had the rank of Sergeant and supervised the entries under

Hammond's supervision.

31.     Carson was the investigating and arresting officer.

32.     Guinares, Hammond, and Thomas entered the Premises and 2F and supervised the events that led up to the issuance of the warrants, the entries and searches that followed, and the arrests and prosecutions that occurred subsequently.

33.     The remaining individual defendants, each of whom was assigned to the NBBN, participated in the entry and arrest of plaintiffs.

The Issuance of the Search Warrants

34.     The search warrants authorizing the defendants' entry into the Premises and 2F were each procured by Carson on or about November 7, 2013.

35.     The warrant for the Premises was obtained by defendant Carson based on false or materially incomplete or deceptive factual statements by Carson, either directly to the Criminal Court of the City of New York, which issued the warrant, or to the prosecutors who assisted in procuring the warrant, which were designed to mislead the issuing Court into wrongly concluding that sufficient legal cause existed to justify the issuance of the warrant.

36.     The warrants into the Premises and 2F were obtained at the same time by Carson as the result of a purported investigation into alleged drug sales from both apartments that was carried out simultaneously by the defendants.

37.     According to Carson, a confidential informant, known as CI-0091082 (the "CI"), went to 604 Georgia Avenue on various dates, including September 3, November 5, and November 12, 2013, for the purpose of making controlled purchases.

38.    According to Carson, on each of these dates, the CI went to both the Premises and to 2F and purchased crack cocaine and/or heroin from these locations.

39.    According to Carson, the CI went from one apartment to the other in order to make these purchases.

40.    Carson has since testified that she was not sure if the plaintiffs were operating cooperatively with the individuals in 2F or if it was just a coincidence that there were two sets of dealers selling crack cocaine and heroin in the same five-unit building.

41.    In fact, at no time were either of the plaintiffs ever in possession of crack cocaine or heroin within the Premises and no such purchases or sales ever attempted, much less consummated, and Carson's claims that the CI made controlled purchases from plaintiffs were entirely false and fabricated in all respects.

42.    The residents of 2F have previously filed a civil suit against Carson in which they too deny ever possessing such narcotics in 2F, much less selling them. That suit was docketed in the United States District Court for the Eastern District of New York as 15-CV-5841 (MKB) (VMS).

43.    The claims of controlled purchases from both the Premises and 2F were false. It may have been that the CI was actually present and attempted unsuccessfully to make these purchases, or that the CI was never present at all and Carson fabricated both her presence and the purchases. In either event, none of these controlled purchases occurred and Carson's claims that they did were flagrant fabrications.

<u>Post-Arrent Events and the Prosecution</u>

-6-

44.     The plaintiffs were transported to a local NYPD station house, where they remained in defendants' custody while their arrests were processed.

45.     The plaintiffs were then transported to Central Booking, where they were further imprisoned by defendants for a period of hours.

46.      While plaintiffs were imprisoned by the defendants, defendant Carson completed arrest paperwork in which she expressly claimed that she had found plaintiffs in possession of crack cocaine, marijuana and drug paraphernalia.

47.     These claims were materially false and defendants knew them to be false at the time they were made.

48.     Carson forwarded these false allegations to both the Kings County District Attorney ("KCDA") and the Special Narcotics Prosecutor ("SNP") in order to justify the arrest and to persuade the KCDA and/or SNP to initiate the plaintiffs' criminal prosecution.

49.     The defendants knew that Carson would be utilizing these false and statements of fact to justify their arrest of plaintiffs and to persuade prosecutors to initiate plaintiffs' criminal prosecution.

50.     Carson knew and understood that the KCDA and/or SNP, in evaluating whether to commence a criminal prosecution against the plaintiffs, would rely on the truthfulness of her claims and statements, and would proceed on as assumption that all of these factual statements and claims were truthful in all material respects, and that no material or exculpatory information had been withheld.

-7-

51.     As a direct result of these false allegations by the defendants, the plaintiffs were each arraigned on or between November 13 and 15, 2013, and criminally charged by the KCDA under dockets 2013KN087274 and 2013KN087275 with various charges related to plaintiffs' supposed possession of crack cocaine, marijuana, and drug paraphernalia.

52.     The case was never presented to a grand jury and plaintiffs were not indicted. Both plaintiffs were required to appear in court numerous times thereafter on threat of imprisonment.

53.     Three adults were arrested in 2F at the same time as plaintiffs were arrested in the basement. One of these individuals, Kymahli Lysius, was released from Central Booking after the KCDA declined his prosecution. The remaining individuals, Natasha Smith and Jeff Lysius, were arraigned at or around the same time as the plaintiffs, and formally charged with the possession of crack cocaine, marijuana, and paraphernalia, and prosecuted under docket numbers 2013KN087260 and 2013KN087261 by the KCDA.

54.     The plaintiffs' prosecution proceeded separately from that of the two residents of 2F.

55.     The 2F residents were, upon information and belief, charged with possessing a larger quantity of narcotics and marijuana than the plaintiffs.

56.     The criminal prosecution of the 2F residents were dismissed in early 2014 and their cases terminated in favor of Ms. Smith and Mr. Lysius.

57.     The case against the plaintiffs was not terminated at that time.

-8-

58.     Both plaintiffs moved to contravene the warrant, and on August 6, 2014, the criminal court ordered a Darden hearing, which required the KCDA to produce the CI for an in camera interview.

59.     The KCDA failed to produce the CI and was unable to provide an explanation for the CI's unavailability. Thus, on September 10, 2014, the criminal court dismissed all charges, ruling:

> The People having neither produced the confidential informant to the Court, nor sufficiently explained their failure to do so, nor sufficiently demonstrated to the Court that the People would likely be able to produce the confidential informant if given additional time to do so, the motion to controvert the warrant is hereby GRANTED.
>
> There being no remaining basis for the charges against either defendant. the two cases are therefore DISMISSED.

<u>Defendants' Malice</u>

60.     There is ample evidence of defendants' actual malice towards both the plaintiffs and the residents of 2F beyond that which can be inferred by the defendants' fabrication of evidence to procure the warrant, and subsequent falsified claims to having recovered narcotics, marijuana, and related paraphernalia in the Premises.

61.     For example, on or about April 21, 2014, while the criminal case against the plaintiffs was pending, the defendants, supported by a sworn affidavit from defendant Carson, initiated nuisance abatement proceedings against the plaintiffs and the putative owner of 604 Georgia Avenue based solely on the supposed controlled purchases made by the CI from the plaintiffs at the Premises, including the same non-existent

purchases Carson referenced in her application for the search warrant. These proceedings were filed in New York State Supreme Court, Kings County, under Index Number 6080/2014.

62.     As for the residents of 2F, the defendants contacted New York City's Administration for Children's Services ("ACS") to initiate the filing of a neglect petition against Ms. Smith and Mr. Lysius. As a result, the petition was filed and ACS began its investigation within days or weeks of the arrest.

63.     The nuisance abatement proceedings were ultimately resolved with a stipulation.

64.     With respect to the neglect proceedings, ACS declined to remove the children from the home. After various interviews and a series of court appearances, the petitions were dismissed.

65.     Both the plaintiffs and the residents in 2F had been accused of the possession of misdemeanor possession charges. No weapons or large amounts of cash were recovered, and the institution of these collateral charges were not only knowingly founded on falsified evidence, but were also excessive and grossly disproportionate to the charged crimes and conduct.

66.     Upon information and belief, the collateral proceedings were also not ordinarily initiated under such circumstances, further evincing the defendants' actual malice towards the plaintiffs (and the residents of 2F).

67.     Finally, in May 2015, Carson and other members of the NYPD

returned to the Premises and again arrested the plaintiffs on narcotics charges.

68.     The May 2015 arrest was made pursuant to a search warrant that was again procured based on allegations of drug sales.

69.     While it was Carson's colleague, Det. Emrah Ates, who obtained that warrant, Carson was present at the May 2015 arrest.

70.     Ates himself had been present at 2F on November 13, 2013, and was one of Carson's co-defendants in the lawsuit filed by the residents of 2F.

71.     Not coincidentally, by May 2015, both Carson and Ates had been deposed in the lawsuit filed by the residents of 2F, and were well aware of the litigation when the May 2015 arrests were made, as reflected by Carson's aggressive and hostile statements to plaintiff Hyland about Natasha Smith while plaintiff was in defendants' custody.

72.     The May 2015 arrests were ultimately resolved on or about October 15, 2016, when plaintiffs plead to a single charge of disorderly conduct.

73.     The origins of defendants' malice towards plaintiffs prior to November 2013 likely stems from the NYPD's prior dealings with John Dixon, including a prior lawsuit against the City of New York and members of the NYPD that had resulted in a $200,000 settlement.

The 2F Residents' Lawsuit

74.     Ms. Smith and Mr. Lysius filed their action against the City of New York, Carson, and other defendants, on or about October 6, 2014. Service was made shortly thereafter and the litigation proceeded promptly.

-11-

75.     The 2F plaintiffs alleged that there were no controlled purchases, that Carson fabricated evidence to obtain the search warrant, further fabricated evidence by falsely claiming that narcotics were found in 2F, and then sought to punish plaintiffs by causing a child neglect petition to be filed.

76.     The litigation was resolved in stages. Plaintiffs Jeff Lysius and Kymahli Lysius each accepted Offers of Judgment in the amount of $25,001. The offers further included a separate payment of legal fees and costs, which were settled for $40,000, so that the aggregate amount paid with respect to resolve these two plaintiffs' claims was $90,002.

77.     Plaintiff Natasha Smith settled her claims sometime later in 2015 for $90,000, bringing the aggregate total paid by the City of New York to $180,002.

## FIRST CAUSE OF ACTION

78.     Plaintiffs repeat the allegations contained in the preceding paragraphs as though stated fully herein.

79.     The individual defendants willfully and intentionally entered the Premises without a lawfully obtained warrant and conducted a search thereof with no legal basis and no reasonable basis to believe that said search was not unconstitutional, and thus violated plaintiffs' right to be free from unreasonable searches.

80.     The individual defendants falsely arrested the plaintiffs and caused them to be falsely imprisoned, by arresting them without probable cause, and without any reasonable basis to believe that probable cause existed for their arrest.

81.     The individual defendants fabricated evidence and lied about the circumstances of the plaintiffs' arrest, and then forwarded the fabricated evidence to prosecutors, causing plaintiffs to be denied their right to a fair trial and to be maliciously prosecuted.

82.     The individual defendants utilized more force than was reasonably necessary to effectuate the arrest of plaintiff Dixon, and without a reasonable basis to believe that such force was necessary.

83.     Each of the individual defendants actively participated in the above misconduct. To the extent that any of these defendants did not personally participate, he or she was well aware of the misconduct but chose not to intervene or otherwise take reasonable steps to protect the plaintiffs from the unconstitutional conduct of his or her fellow officers and supervisors, despite ample opportunity to do so.

84.     By so doing, the individual defendants, individually and collectively, subjected both plaintiffs to unlawful searches of person and property, false arrest and imprisonment, the deprivation of their right to a fair trial through the use of fabricated evidence, and malicious prosecution, and further subjected plaintiff John Dixon to excessive force, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

85.     By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiffs to suffer assorted injuries, including, but not limited to, emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty,

and the loss of their constitutional rights.

## SECOND CAUSE OF ACTION

86.     Plaintiffs repeat the allegations contained in the preceding paragraphs as though stated fully herein.

87.     The individual defendants' entry into the Premises, arrest of the three plaintiffs, and subsequent actions, and failure to act, with respect to the criminal prosecutions of the plaintiffs, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

88.     More precisely, under this policy or plan, officers within the Narcotics Division generally, and NBBD in particular, would knowingly make arrests of individuals regardless of whether there was any factual basis for the charges.  The arresting officer(s) would then make false statements of fact as to seeing the individual(s) being arrested in actual or constructive possession of the narcotics in question.

89.     The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

90.     In addition, members of the Narcotics Division are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria.  Thus, members of the Narcotics Division routinely make arrests and engage in other police activity without sufficient legal

cause in order to raise their levels of "activity" and improve the perception of their job performance.

91.     The NYPD generally, and NBBD in particular, tracks the number of arrests made by each officer but does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, members of the Narcotics Division are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

92.     More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges.  The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

93.     The purpose of this policy or plan was to generate large numbers of arrests within the individual commands therein, in order to create a false or misleading impression of positive activity by their officers and satisfying internal quotas.

94.     In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, summonses issued, and other, similar criteria.  Members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity"

and improve the perception of their job performance.

95.     The policy or plan was kept in effect from, at least, 2006 through, at least, the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

96.     Rather than take steps to abolish this plainly unconstitutional and unlawful police, the municipal defendant continued to tacitly endorse this policy of deliberate misconduct.

97.     In October 2011, following a bench trial in  New York State Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports.  Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units."  The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

98.     In an Order dated November 25, 2009, in *Colon v. City of New York,* 09-

CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

99.    It is also manifestly clear through the litigation brought in the Eastern and Southern Districts of New York that countless hundreds, if not thousands, of civilians have alleged that members of the NBBD have deliberately arrested them without probable cause.  Thus, even if the municipal defendant was not the architect of the policy causing these unlawful arrests, they were certainly on notice of the practice.

100.    It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York, at the bare minimum, has been on notice was deliberately indifferent to the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and caused the violation of plaintiffs' rights in particular.

101.    By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

-17-

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiffs demand judgment against defendants jointly and severally as follows:

i. actual and punitive damages against the individual defendants in an amount to be determined at trial;

ii. actual damages against the municipal defendant in an amount to be determined at trial; and

iii. statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

iv. such other relief as the Court deems just and proper.

Dated: New York, New York
November 10, 2016

LUMER & NEVILLE
Attorneys for Plaintiffs
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060


Michael B. Lumer (ML-1947)

-18-